## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (KBO) |
| Debtors. | (Jointly Administered) |
| FTX RECOVERY TRUST, | |
| Plaintiff, | Adv. Pro. 24-50197 (KBO) |
| v. | |
| FARMINGTON STATE CORPORATION (f/k/a FARMINGTON STATE BANK, d/b/a GENIOME BANK, d/b/a MOONSTONE BANK), FBH CORPORATION, and JEAN CHALOPIN, | |
| Defendants. | |

## <u>AMENDED COMPLAINT</u>

---

[1]    The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063, respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. Such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX. The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

Plaintiff files this Complaint to recover damages caused by Defendants' aiding and abetting in breaches of fiduciary duties and corporate waste and to recover fraudulent transfers made prior to the commencement of the above-captioned Chapter 11 cases (the "Chapter 11 Cases").[2] Plaintiff alleges the following based upon personal knowledge as to itself and its acts based upon its investigation to date, and upon information and belief as to all other matters.

## PRELIMINARY STATEMENT

1.      Samuel Bankman-Fried ("Bankman-Fried") and a group of insiders, including Zixiao "Gary" Wang ("Wang"), Nishad Singh ("Singh") and Caroline Ellison ("Ellison") (hereinafter, the "FTX Insiders"), orchestrated a vast fraudulent scheme to profit at the expense of the Debtors in these Chapter 11 Cases and their creditors.

2.      As has been detailed extensively in criminal indictments, the criminal trial of Bankman-Fried, prior civil complaints, and reports filed and issued by the FTX Debtors, far from generating genuine profits, the exponential growth and purported success of the FTX Debtors were, in fact, fueled by a host of reckless and fraudulent practices perpetrated by, and for the benefit of, the FTX Insiders. These practices included, among others, billions of dollars of wildly speculative and unhedged bets in crypto assets and frenzied investment in hundreds of imprudent "ventures," paid for by, among other things, looting the FTX Group of billions in customer deposits. Indeed, on November 2, 2023, having heard evidence of the staggering embezzlement of billions of dollars of customer funds, it took a jury just three hours to find Bankman-Fried guilty on all counts.

---

[2]  The term "FTX Group" means, collectively, any entity that filed voluntary chapter 11 petitions in the United States under the Bankruptcy Code in the Chapter 11 Cases (the "Debtors") and all affiliates of the Debtors that have not filed voluntary chapter 11 petitions in the United States under the Bankruptcy Code.

3.     Under the cloak of this wide-ranging con game, the FTX Insiders facilitated the routing of billions of dollars in purported profits of FTX and the FTX Group to the FTX Insiders and their families, friends, and other acquaintances through purported personal "loans," bonuses, "investments," and all other means of transfer, including real estate purchases and hundreds of millions of dollars in charitable and political contributions.

4.     This Complaint concerns one of those "investments."  In early 2022, Clifton Bay Investments LLC (f/k/a Alameda Ventures LLC, or "Alameda Ventures") invested $11.5 million into Defendant FBH Corporation ("FBH"), a company owned and controlled by Defendant Jean Chalopin ("Chalopin"), in exchange for an approximately 10% interest in FBH.  FBH had acquired Defendant Farmington State Bank ("Farmington") in 2020.  Through Deltec International Group and its subsidiaries, Chalopin had formed a deep relationship with the FTX Group by giving them preferential banking treatment, and this investment—albeit done at an absurd price—represented the next step in that deepening relationship.

5.     Around the time of Alameda Ventures' investment in FBH, Farmington was the nation's 28th smallest bank by assets and its reported net worth was $5.7 million, meaning Alameda Ventures paid an amount equal to double the bank's entire reported net worth for just a 10% interest.  Farmington, at the time, operated as a single-branch bank and community lender to the small agricultural town of Farmington, Washington.  In this role, it provided traditional banking and lending services, and reportedly did not offer online banking or even any credit cards. Following the investment, Farmington, however, quickly rebranded as Geniome Bank and then Moonstone Bank ("Moonstone").

6.     Shortly after the investment, Moonstone proclaimed that its new business model was to support "the evolution of next generation finance."  To that end, Moonstone increased its

focus on cryptocurrencies, cannabis, and banking-as-a-service (i.e., providing banking infrastructure and services to other businesses). It made significant changes to senior management, including hiring Chalopin's son as Chief Digital Officer. All of the new hires were purportedly referrals or past colleagues.

7.      But Moonstone's new business model violated regulatory restrictions that had been in effect at least since the date on which Chalopin had acquired Farmington. These restrictions required FBH and Moonstone to receive approval before changing the bank's business plan, changing senior management, expending resources to develop digital banking products and customer-facing applications, or pursuing a strategy focused on digital banking services.

8.      The FTX Group also opened bank accounts with Moonstone to facilitate a $50 million tax safe-harbor required by a transaction with another U.S. company. After federal prosecutors seized that $50 million in the Moonstone bank account of an FTX Group affiliate in connection with the indictment of Bankman-Fried, the bank rebranded once more and returned to its original name, Farmington, and original purpose as a community bank.

9.      But the damage had been done. Chalopin had acquired Moonstone subject to regulatory restrictions and induced the FTX Group to invest into it based on a business model that violated those restrictions. Farmington's assets were sold and it was ultimately directed by the Federal Reserve Bank ("Federal Reserve") to wind down, rendering the FTX Group's investment worthless, or at minimum, significantly devalued.

10.     On November 11 and November 14, 2022, (as applicable, the "Petition Date"), the Debtors filed with the Court voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. Joint administration of the Chapter 11 Cases was authorized by the Court by an order entered on November 22, 2022. Chapter 11 Cases, D.I. 128. No trustee has been appointed for

Alameda Ventures or any other Debtor in the Chapter 11 Cases.  On October 8, 2024, the Court entered an order confirming The Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and its Debtor Affiliates.  Chapter 11 Cases, D.I. 26404.  Pursuant to the *Order Granting the FTX Recovery Trust's Omnibus Motion to Substitute Plaintiffs in Adversary Proceedings* [Chapter 11 Cases, D.I. 29554] and the *Notice of Substitution of Plaintiff* [Adv. D.I. 14], the FTX Recovery Trust is now the proper Plaintiff and has substituted in for Debtor Alameda Ventures that initially filed this action.  Accordingly, Plaintiff has the authority to file this Amended Complaint and prosecute this adversary proceeding.

11.     As has been detailed in previous pleadings and testimony in these Chapter 11 Cases, the FTX Debtors lacked any internal accounting and records, and often failed to perform traditional due diligence, or maintain the files relating to such diligence in an organized fashion, or at all.  *See, e.g.*, First Interim Report of John J. Ray III to the Independent Directors of Control Failures at the FTX Exchanges 10-14 (filed April 9, 2023), Chapter 11 Cases, D.I. 1242-1.  It took post-petition management and its professionals many months to recreate certain information relevant to this action.

12.     Moreover, some of the communications between Chalopin and FTX were conducted via the Signal messaging platform, which contains an auto-delete feature.  This is also true of numerous communications among the FTX Insiders.  Some of those messages are thus unavailable to the FTX Recovery Trust.

13.     By this action, Plaintiff seeks to recover damages caused by Defendants aiding and abetting breaches of fiduciary duties and corporate waste and to recover all amounts fraudulently transferred to the Defendants, including the $11.5 million invested in FBH and any other things of value.

5

## RELEVANT PARTIES

14.     Pursuant to the *Order Granting the FTX Recovery Trust's Omnibus Motion to Substitute Plaintiffs in Adversary Proceeding* [D.I. 29554] and the *Notice of Substitution of Plaintiff* [Adv. D.I. 14], the FTX Recovery Trust is now the proper Plaintiff and has substituted in for Debtor Alameda Ventures that initially filed this action.

15.     Debtor Alameda Research Ventures LLC is a Delaware limited liability company.

16.     Non-party debtor FTX Trading Ltd. ("FTX") is incorporated under the laws of Antigua and Barbuda.

17.     Non-party debtor Alameda Research LLC ("Alameda") is a Delaware limited liability company that had operations in the United States, Hong Kong, and the Bahamas. Bankman-Fried and Tara Mac Aulay ("Mac Aulay") co-founded Alameda in or around November 2017, and its sole equity owners were Bankman-Fried (90%) and Gary Wang ("Wang") (10%). Bankman-Fried was the Chief Executive Officer ("CEO") of Alameda from its inception until around October 2021.  At all relevant times, however, Bankman-Fried retained substantial control over Alameda.

18.     Non-party debtor West Realm Shires Inc. ("WRS") is a Delaware corporation that is 52.99% owned by Bankman-Fried, 16.93% owned by Wang, 7.83% owned by Singh, and 22.25% owned by other shareholders.  It began operations in or around January 2020.

19.     Non-party debtor West Realm Shires Services Inc. ("FTX US") is a Delaware corporation and a wholly-owned subsidiary of WRS.

20.     Defendant Farmington was a one branch state-member bank located in Farmington, Washington.  Upon information and belief, from 1929 until the events giving rise to this complaint, Farmington operated as a one-branch bank serving a rural community in Washington by providing traditional bank accounts and loans to residents of Farmington and various farming operations.

21.     Defendant FBH is a corporation organized under the laws of Maryland.

22.     Defendant Chalopin, who is on information and belief a resident of the Bahamas, is FBH's principal shareholder and the company's President and Chairman.

## JURISDICTION AND VENUE

23.     This Court has original jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012, because it relates to the Chapter 11 Cases brought under Title 11 of the United States Code (the "Bankruptcy Code").

24.     Counts I through IV are "core" proceedings which may be heard and determined by the Court pursuant to 28 U.S.C. § 157(b)(2).  Counts V and VI are non-core, but are related to the Chapter 11 Cases.

25.     Venue of this adversary proceeding in this District is proper pursuant to 28 U.S.C. § 1409, and is consistent with the interests of justice, judicial economy, and fairness.

26.     The statutory predicates for the relief requested herein are Sections 544, 548, 550, and 105 of the Bankruptcy Code and Sections 1304 and 1305 of Title 6 of the Delaware Code.

27.     In accordance with Rule 7008-1 of the Local Rules of the United States Bankruptcy Court for the District of Delaware, Plaintiff confirms its consent to the entry of a final order or judgment by the Court in connection with this adversary proceeding to the extent that it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

## FACTUAL BACKGROUND

I.    **THE FTX GROUP'S FOUNDING**

28.    The formation of the FTX Group has been fully detailed in various indictments and prior pleadings. *See, e.g.*, Superseding Indictment ¶ 9-12, *United States v. Bankman-Fried*, 22-cr-00673 (S.D.N.Y. Feb. 22, 2023), ECF No. 80; *Alameda Research LLC et al. v. Allan Joseph Bankman & Barbara Fried*, Adv. Pro. 23-50584-JTD (Bankr. D. Del. Mar. 15, 2024), ECF No. 26.

29.    In short, in November 2017, Bankman-Fried and Mac Aulay co-founded Alameda, which they described as a quantitative trading firm focusing on cryptocurrency. Alameda, however, failed to maintain appropriate records and did not implement sufficient internal controls or risk management. Indeed, multiple former high-level FTX Group executives left the FTX Group due to risk management, governance, and compliance concerns. These executives included Mac Aulay and the former President of FTX US.

30.    Bankman-Fried and Wang subsequently created FTX.com, a cryptocurrency exchange in 2019.

31.    FTX.com quickly became one of the largest digital asset exchanges in the world. Following the initial success of FTX.com, in January 2020, Bankman-Fried followed up by founding FTX US (FTX.US, and together with FTX.com, the "Exchanges"), a digital asset exchange that U.S.-based customers could use.

32.    The Exchanges were extraordinarily successful in attracting customers and their cash, cryptocurrency, and other assets. By 2021, the Exchanges claimed to hold approximately $15 billion in assets on their platforms and to transact $16 billion in daily trading volume.

33.    As the world learned in November 2022, in reality the Exchanges served as piggy banks Bankman-Fried and the FTX Insiders looted to fund billions of dollars in recklessly

speculative and unhedged trading by Alameda.  The Exchanges also funded billions more in purported "venture" investments, real estate purchases, purported personal "loans," charitable and political contributions and all manner of other transfers designed to benefit themselves by buoying their lifestyles, lining their own and their families' and friends' pockets, and ingratiating themselves with numerous business prospects and potential allies.

## II.    DEFENDANTS CAUSED THE FTX GROUP TO WASTE MILLIONS OF DOLLARS ON AN INVESTMENT IN A BANK THAT THE FEDERAL RESERVE LATER SHUT DOWN

34.    As of 2020, Farmington was a single-branch bank and community lender to the small agricultural town of Farmington, Washington.  Consistent with that focus, it provided traditional banking and lending services, and reportedly did not offer online banking or even any credit cards.  Chalopin subsequently acquired Farmington via a holding company, FBH, and induced the FTX Group to invest into it in January 2022.

35.    By the time he acquired Farmington, Chalopin was involved in various business activities relating to cryptocurrency and was well known to the FTX Group, where a senior lawyer stated that "we have a longstanding relationship [with Chalopin] on many fronts."  Indeed, over a period of years Chalopin had built a deep relationship with the FTX Group.  Through companies he controlled, Chalopin banked and insured the FTX Group.

### A.    Chalopin Builds A Deep Relationship With The FTX Group.

36.    Chalopin has ultimate beneficial ownership of a controlling majority interest in Deltec International Group, which wholly owns the Bahamas-based Deltec Bank and Trust Company Limited ("Deltec Bank") as well as other financial services companies.

37.    Chalopin spent years cementing the relationship between the FTX Group, on the one hand, and himself and Deltec International Group and its subsidiaries, on the other.  For

instance, Relm Insurance—which Chalopin created with its co-founder—insured FTX.US as one of the few available insurers for the cryptocurrency industry.

38.     But Chalopin had a more fundamental connection to the FTX Group.  Chalopin helped lay the foundation necessary for the FTX Group to move to the Bahamas, as he and Deltec Bank used their connections in the Bahamas to advance the FTX Group's interests.  As Mr. Chalopin put it, the Bahamian government "were one of the first regulators to put together something," and "that attracted FTX."  With respect to Deltec's involvement, he believes that "[i]t would be nothing in the Bahamas today if it weren't for us [i.e., Deltec] in the beginning."

39.     The FTX Group, Chalopin, and Deltec created and maintained a symbiotic relationship in the years to come, often directly through Chalopin.  The FTX Group opened several accounts at Deltec Bank starting in 2018, including accounts for Alameda Research Ltd., FTX Trading Ltd., and West Realm Shires Services Inc. (d/b/a FTX.US).  From 2018 to the Petition Date, those accounts processed hundreds of thousands of transactions worth billions of dollars.

40.     This relationship proved its value several times for the FTX Group.  Deltec Bank may have extended the FTX Group a *de facto* line of credit, allowing a three-day grace period to transfer fiat currency to settle purchases of a certain cryptocurrency.  That is, Deltec Bank may have facilitated the issuance of that cryptocurrency by the FTX Group and then permitted a transfer of fiat currency sufficient to pay for those issuances up to three days later.

41.     Deltec Bank also came through for the FTX Group in its time of need.  Shortly after a crypto crash began on May 11, 2022, Gregory Pepin (Deltec Bank's erstwhile deputy CEO) told FTX Group employees that he would process their bank redemptions before he processed any other transfers.

42.     The relationship between Chalopin, Deltec, and the FTX Group continued strong throughout the years, with Deltec co-sponsoring the FTX Group's Crypto Bahamas summit in April 2022.  In a statement announcing that sponsorship, Chalopin described Deltec International Group as "a long-time friend of FTX, and it is our pleasure to support them."  Chalopin (as well as Deltec Bank's CEO) spoke at the summit, saying that "We are here because we embraced that vision of the future."  *CoinDesk* later described the summit as a "four-day flex of FTX's expanding empire – with a new era of 'corporate crypto' firmly on display."

43.     During the course of this relationship, Deltec Bank also often exempted the FTX Group from full bank diligence requirements known as know-your-customer ("KYC").  For example, after Deltec Bank requested a copy of Gary Wang's passport, Pepin stated that his colleague "will certify [the passport as required for KYC] … [the colleague] does everything including cooking and cleaning … he is really good :p".  On another occasion, Pepin told FTX Group employees that he had done something "outside the guidelines to rush things lol" for their benefit.

44.     Thus, having done profitable business with the FTX Group for years through Deltec, Chalopin knew the potential value to his business interests in pairing banking with cryptocurrency.  The FTX Group knew the potential value to their business interests of having a friendly bank run by a friendly associate.  Together, they set their sights on recreating this symbiosis of banks and cryptocurrency companies in a new market:  the United States.

**B.     Chalopin Purchases Farmington And Secures Investment From The FTX Group.**

45.     Chalopin earlier formed FBH, became its principal shareholder (and, on information and belief, its only shareholder) and President, and orchestrated FBH's acquisition of Farmington.  In approving applications by Chalopin and FBH to operate FBH as a bank holding

company and acquire Farmington, the Federal Reserve and the relevant Washington state supervisor imposed conditions on FBH and Farmington (the "Regulatory Restrictions").   On information and belief, Chalopin met some of those regulators in person in the United States to discuss his acquisition and the business of FBH and Farmington.

46.    Among other things, the Federal Reserve required notice if FBH changed Farmington's business plan or engaged in digital bank servicing operations on behalf of Farmington; and the state supervisor required, for a period of three years, prior written regulatory approval for changes in senior management, changes in the business plan, and significant forays into digital banking operations.

47.    The Federal Reserve also imposed several conditions on Chalopin personally, including that he would annually provide the Federal Reserve with certain financial information related to Deltec Bank, and that neither he nor any entity he controlled would engage in related-interest transactions with the Bank.

48.    Beginning in 2021, Chalopin became personally and professionally close with an FTX Group legal officer ("Legal Officer-1").  Legal Officer-1 and Chalopin met several times in Seattle and in the Bahamas, and Chalopin made several introductions to contacts in the Bahamas.

49.    In August 2021, Chalopin and Legal Officer-1 started discussing an investment by the FTX Group into FBH.  On information and belief, FBH at the time had no assets other than its equity interest in Farmington.

50.    On August 22, 2021, Chalopin asked Legal Officer-1, "As I [am] preparing the papers for the investment into our WA bank, could you let me know if the company (or person?) investing into it would be US or non-US?"  The original agreement was drafted for an individual to be the investor and had to be reworked for the investor to be a U.S. entity.

51.     Chalopin knew that Legal Officer-1 resided in the United States.  On information and belief, Chalopin discussed that investment with Legal Officer-1 while physically present in the United States.  Chalopin also discussed that investment with Legal Officer-1 over Zoom several times September to August 2021.

52.     In late January 2022, Bankman-Fried signed a Subscription Agreement and directed Alameda Ventures to pay $11.5 million for 110,000 shares (or approximately 10%) of FBH.  Chalopin, from an email address associated with Farmington, put his personal lawyer in touch with employees of the FTX Group to get the Subscription Agreement signed and a required investor questionnaire filled out.  Alameda Ventures made the payment on February 2, 2022 to FBH.

53.     That was an astronomical amount to pay for a 10% interest in a small community bank with relatively few assets—indeed, although the investment implied a $115 million valuation of FBH, media reports state that the entire net worth of Farmington (FBH's sole asset) was only $5.7 million.  The Subscription Agreement was countersigned by Chalopin in his capacity as President of FBH.

54.     Following Alameda's investment, Farmington issued a press release coordinated with the FTX Group (that Chalopin provided input on), rebranded itself as Geniome Bank, and then quickly rebranded again as Moonstone Bank.  Within months, it touted "significant progress … on becoming the only fully chartered bank dedicated to offering a wide array of financial services to specialty industries," including cryptocurrencies, banking-as-a-service, and cannabis. It also hired new personnel for key roles, such as Janvier Chalopin (Chalopin's son) as Chief Digital Officer.

55.     This new focus was, on information and belief, motivated by FTX's investment. It also meant that Moonstone's success depended on its ability to offer online banking to its customers, which in turn required prior written approval of the Federal Reserve and its state supervisor due to the Regulatory Restrictions. Despite this, Defendants proceeded with this new business model without receiving the necessary approval.

56.     Chalopin continued to communicate with Legal Officer-1 about Moonstone's business model up until early November 2022. In October 2022, Chalopin indicated to Legal Officer-1 that he was "on the Exec Co of Moonstone" and asked if the FTX Group would be making an additional $50 million deposit at Moonstone. Chalopin also told Legal Officer-1 in November 2022 that he was "on line with Moonstone now. They are ready to go" with a program to implement the new business model.

57.     Moonstone never realized its new business plan. On January 4, 2023, federal prosecutors seized $50 million from the Moonstone bank account of an FTX Group affiliate in connection with the indictment of Bankman-Fried. Moonstone closed crypto client bank accounts within weeks, stating that it was "returning to its original mission as a community bank and is discontinuing its pursuit of an innovation-driven business model to develop banking services for industries such as crypto assets." It rebranded back to Farmington.

58.     On May 12, 2023, Farmington and FBH entered an agreement to sell all of Farmington's deposits and assets to the Bank of Eastern Oregon.

59.     On July 18, 2023, the Federal Reserve announced an enforcement action against Farmington and FBH, noting that they had violated commitments to the Federal Reserve and the state supervisor "by engaging in activities which changed [Farmington]'s business plan and general character without receiving prior written approval." Farmington had violated those

commitments by, among other things, shifting to a focus in online banking and taking material steps to facilitate cryptocurrency offerings.

60.     The Federal Reserve's enforcement action provided for Farmington's operations to wind down and prohibited Farmington or FBH "from making dividends or capital distributions, dissipating cash assets, and engaging in certain activities without approval from its supervisors." As a result, the FTX Group's $11.5 million dollar investment has been rendered worthless, or, at a minimum, has lost a significant amount of its value.

## III.   ALAMEDA VENTURES WAS INSOLVENT AT ALL RELEVANT TIMES

61.     Alameda Ventures was insolvent at all relevant times.   As alleged in the superseding indictment of Bankman-Fried, the FTX empire was built on a house of cards.   "From at least in or about 2019, up to and including in or about November 2022," Bankman-Fried "corrupted the operations of the cryptocurrency companies he founded and controlled ... through a pattern of fraudulent schemes ... ."  Superseding Indictment ¶ 1, *United States v. Bankman-Fried*, No. 22-cr-00673 (LAK) (S.D.N.Y. Feb. 23, 2023), ECF No. 80.

62.     The FTX Insiders failed to implement virtually any of the systems or controls necessary for companies entrusted with customer money or other assets.   The FTX Insiders concealed the FTX Group's failing and insolvent state by raiding and misappropriating billions of dollars in cash, cryptocurrency, and other assets deposited by customers.   The FTX Insiders and FTX Group senior management accomplished this through multiple deceptions, including lying to customers about the segregation and safety of their accounts, and creating a series of secret mechanisms by which assets could be transferred within the FTX Group's capital structure, and, ultimately, out of the FTX Group's custody.   As alleged in the indictment, Bankman-Fried's "multi-billion-dollar fraud" was executed "through a series of systems and schemes that allowed"

Bankman-Fried and other FTX Insiders "to access and steal FTX customer deposits without detection." *Id.* ¶ 4.

63.     From the beginning of the FTX.com exchange, funds that customers intended to be deposited on the exchange in fact were deposited with Alameda.  At the same time, although the FTX Group's exchange software generally did not allow for an account on the exchange to carry a negative balance, in or around July 2019, Bankman-Fried directed one or more of his co-conspirators or individuals working at their behest to modify the exchange software to permit Alameda to maintain a negative balance in its account on the exchange, including modifying settings in the exchange software known as "borrow," "can_withdraw_below_borrow," and "allow_negative."

64.     Through these cheats, Alameda was not only able to evade collateralizing its position on the exchange; it also was able to maintain a negative balance on the exchange and utilize the exchange to trade and withdraw assets without limit, giving it a virtually unlimited "line of credit" collateralized by the customer deposits on the exchange.  As of the commencement of the Chapter 11 Cases, the exchange's software had been tampered with to an extent sufficient to expand Alameda's "line of credit" to $65 billion.  Alameda lacked the ability to repay this line of credit, having spent the money on insider transfers and purported "loans," gifts, and questionable investments, including the $11.5 million transferred to Defendants.

65.     FTX Insiders' insatiable need for funds was not limited to propping up Alameda in the face of extreme risk and management failures. Bankman-Fried and other FTX Insiders needed funds to pay for billions of dollars in ill-conceived and outright fraudulent transfers.  The FTX Group's improper outflows and expenditures are staggering.  Billions of dollars were wasted on overpriced assets and investments that were worth only a fraction of the amounts invested.  Billions

of dollars were also spent on purported  "loans," gifts, and other transfers to Bankman-Fried, other senior management, their friends and families, and political contributions, which rendered Alameda Ventures insolvent at all relevant times, including when the subject transfer was made on February 2, 2022.

66.    In the early hours of November 11, 2022, Bankman-Fried signed a document turning over control of the FTX Group to John J. Ray III.

67.    On November 11 and 14, 2022, the Debtors filed for Chapter 11 bankruptcy, commencing the Chapter 11 Cases.

68.    The FTX Insiders' conduct has been the subject of criminal proceedings initiated by federal prosecutors and actions brought by the Securities and Exchange Commission ("SEC"), the Commodity Futures Trading Commission ("CFTC"), and investigations by a host of regulators. Guilty pleas entered by certain FTX Insiders have confirmed that they and other FTX Insiders engaged in a fraudulent scheme and other criminal acts in their operation of the Debtors.  FTX Insiders, except for Bankman-Fried, have pleaded guilty to crimes perpetrated through the very practices that underlie this action.

69.    On December 19, 2022, Wang pleaded guilty to wire fraud and aiding and abetting the same, conspiracy to commit wire fraud, conspiracy to commit commodities fraud, and conspiracy to commit securities fraud.  In connection with his plea, Wang admitted that in 2019 he made "certain changes to [the FTX.com] code" to give Alameda  "special privileges on the FTX platform," including to allow Alameda unfettered use of assets on the FTX.com exchange, even while Alameda maintained negative balances in its own holdings of fiat (*i.e.,* government-issued)

currencies and cryptocurrencies.[3]   Using these "special privileges," the FTX Insiders frequently caused Alameda to misappropriate funds from the FTX.com exchange for their own benefit.

70.     Also on December 19, 2022, Ellison pleaded guilty to two counts of wire fraud and aiding and abetting the same, two counts of conspiracy to commit wire fraud, conspiracy to commit commodities fraud, conspiracy to commit securities fraud, and conspiracy to commit money laundering.[4]

71.     The SEC charged Wang and Ellison in a parallel proceeding, alleging, among other things, that they manipulated the price of FTT, an FTX.com-issued exchange crypto security token.[5]   Ellison and Wang entered into consent orders with the CFTC as to their liability for engaging in fraud in violation of Section 6(c)(1) of the Commodity Exchange Act and CFTC Regulation 180.1.[6]

72.     On February 28, 2023, Singh pleaded guilty to wire fraud and aiding and abetting the same, and five conspiracy charges, including conspiracy to commit securities fraud, conspiracy to commit money laundering, and conspiracy to violate federal campaign finance laws.[7]

73.     On December 9, 2022, the U.S. Attorney's Office for the Southern District of New York indicted Bankman-Fried, charging him with two counts of wire fraud, as well as four counts

---

[3]   Wang Plea Agreement (Information & Waiver of Indictment) and Plea Tr. 24:6-10, *United States v. Wang*, No. 22-cr-00673 (S.D.N.Y. Dec. 19, 2022), ECF Nos. 6–7, 21.

[4]   Ellison Plea Agreement (Information & Waiver of Indictment), *United States v. Ellison*, No. 22-cr-00673 (S.D.N.Y. Dec. 19, 2022), ECF Nos. 8–9.

[5]   *Securities and Exchange Commission v. Ellison and Wang*, No. 1:22-cv-10794 (S.D.N.Y. Dec. 21, 2022).

[6]   CFTC, *Press Release: Caroline Ellison and Gary Wang Acknowledge Liability* (Dec. 21, 2022), https://www.cftc.gov/PressRoom/PressReleases/8644-22.

[7]   Singh Plea Agreement (Superseding Information & Waiver of Indictment), *United States v. Singh*, No. 22-cr-00673 (S.D.N.Y. Feb. 28, 2023), ECF Nos. 90–91.

of conspiracy to commit wire fraud, securities, and commodities fraud, conspiracy to commit money laundering, and conspiracy to defraud the United States and violate campaign finance laws.[8]  As alleged in a Third Superseding Indictment, filed on August 14, 2023, Bankman-Fried conspired to and actually did commit wire fraud, and conspired to commit securities fraud, commodities fraud, and money laundering.[9]  On November 2, 2023, after approximately three hours of deliberation, the jury in the criminal case found Bankman-Fried guilty on all seven counts of fraud, conspiracy, and money laundering.  Bankman-Fried was sentenced to 25 years in prison on March 28, 2024.

74.    Without accounting for the distorting effects of Bankman-Fried and the FTX Insiders' staggering fraud, at all relevant times the FTX Group's liabilities far exceeded the fair value of its assets and the FTX Group lacked sufficient cash, cryptocurrency, and other assets to cover customer accounts and their creditors' claims, leaving it inadequately capitalized and with an inability to pay its debts as they came due.  This was an insolvency further deepened by the additional civil and criminal liabilities imposed on the FTX Group, by Bankman-Fried, and the FTX Insiders' fraudulent conduct.

75.    Alameda Ventures was also insolvent.  Alameda Ventures' assets at the relevant time primarily included investments by FTX Insiders into tenuous and speculative ventures, which were worth only a fraction of the amounts invested.  The fair value of these assets was substantially lower than the size of Alameda Ventures' liabilities.  Alameda Ventures also had inadequate and

---

[8]  *See* Indictment, *United States v. Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Dec. 9, 2022), ECF No. 1.  The Government withdrew its charge of conspiracy to defraud the United States and violate campaign finance laws.

[9]  *See* Third Superseding Indictment, *United States v. Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Aug. 14, 2023), ECF No. 202.

unreasonably small capital to operate its business.  Alameda Ventures continued to operate only because the FTX Insiders continually concealed and lied about its financial condition.

## IV.     THE DEBTORS FILE FOR BANKRUPTCY AND THE FTX INSIDERS ADMIT TO WRONGDOING

76.     In the early hours of November 11, 2022, Bankman-Fried signed a document turning over control of the FTX Group to John Ray.

77.     On November 11 and 14, 2022, the Debtors filed for Chapter 11 bankruptcy, commencing the Chapter 11 Cases.

78.     The FTX Insiders' conduct has been the subject of criminal proceedings initiated by federal prosecutors and actions brought by the Securities and Exchange Commission, the CFTC, and investigations by a host of regulators.  Guilty pleas entered by certain FTX Insiders have confirmed that they and other FTX Insiders engaged in a fraudulent scheme and other criminal acts in their operation of the Debtors.  All of the FTX Insiders, except for Bankman-Fried, pled guilty to crimes and/or civil liability, perpetrated through the very practices that underlie this action, and Bankman-Fried was ultimately convicted on seven counts of fraud, conspiracy, and money laundering on November 2, 2023.

## CAUSES OF ACTION

### COUNT I
### Fraudulent Transfer Pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550
(against Farmington and FBH)

79.     Plaintiff reincorporates and realleges the allegations set forth in Paragraphs 1 through 78 of the Complaint as though the same were set forth in full herein.

80.     On February 2, 2022, Alameda Research transferred $11,500,000 to FBH pursuant to the investment into FBH.

81.     The aforementioned payment to FBH was a transfer of property of Alameda Ventures.

82.     Alameda Ventures did not receive reasonably equivalent value in exchange for the foregoing payment as the investment was virtually worthless, including because, among other reasons, Alameda Ventures' investment for a 10% interest was double the reported value of FBH's sole asset, Farmington, and Defendants' business plan for Farmington centered on transformations that violated the conditions that the Federal Reserve had placed on FBH's acquisition of Farmington.

83.     Alameda Ventures (a) was insolvent on the date of the transfer, (b) became insolvent as a result of the transfer; (c) was engaged in a business or a transaction for which any property remaining with Alameda Ventures was an unreasonably small capital; or (d) intended to incur, or believed that it would incur, debts that would be beyond Alameda Ventures' ability to repay as such debts matured.

84.     Accordingly, the transfer should be avoided as fraudulent pursuant to Section 548(a)(1)(B) of the Bankruptcy Code, and Plaintiff may recover from Farmington and FBH pursuant to Section 550 of the Bankruptcy Code the full amount of such transfers, plus interest

from the relevant dates, and costs and fees to the extent available, for the benefit of the Plaintiff's bankruptcy estate.

**COUNT II**
**Fraudulent Transfer Pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550**
**(against Chalopin)**

85.     Plaintiff reincorporates and realleges the allegations set forth in Paragraphs 1 through 78 of the Complaint as though the same were set forth in full herein.

86.     On February 2, 2022, Alameda Research transferred $11,500,000 to FBH pursuant to the investment into FBH.  That payment was made for the benefit of Chalopin, who was the controller of FBH.

87.     The aforementioned payment to FBH was a transfer of property of Alameda Ventures.

88.     Alameda Ventures did not receive reasonably equivalent value in exchange for the foregoing payment as the investment was virtually worthless, including because, among other reasons, Alameda Ventures' investment for a 10% interest was double the reported value of the bank, and Defendants' business plan for Farmington centered on transformations that violated the conditions that the Federal Reserve placed on FBH's acquisition of Farmington.

89.     Alameda Ventures (a) was insolvent on the date of the transfer, (b) became insolvent as a result of the transfer; (c) was engaged in a business or a transaction for which any property remaining with Alameda Ventures was an unreasonably small capital; or (d) intended to incur, or believed that it would incur, debts that would be beyond Alameda Ventures' ability to repay as such debts matured.

90.     Accordingly, the transfer should be avoided as fraudulent pursuant to Section 548(a)(1)(B) of the Bankruptcy Code, and Plaintiff may recover from Chalopin pursuant to Section

550 of the Bankruptcy Code the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Plaintiff's bankruptcy estate.

**COUNT III**
**Fraudulent Transfer Pursuant to 11 U.S.C. §§ 544(b) and 550**
**(against Farmington and FBH)**

91.     Plaintiff reincorporates and realleges the allegations set forth in Paragraphs 1 through 78 of the Complaint as though the same were set forth in full herein.

92.     Section 544(b) of the Bankruptcy Code authorizes Plaintiff to avoid any transfer of an interest in their property that is voidable under applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent transfers are avoidable pursuant to Bankruptcy Code Section 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301, *et seq*.

93.     On February 2, 2022, Alameda Research transferred $11,500,000 to FBH pursuant to the investment into FBH.

94.     The aforementioned payment to FBH was a transfer of property of Alameda Ventures.

95.     Alameda Ventures did not receive reasonably equivalent value in exchange for the foregoing payment as the investment was virtually worthless, including because, among other reasons, Alameda Ventures' investment for a 10% interest was double the reported value of the bank, and Defendants' business plan for Farmington centered on transformations that violated the conditions that the Federal Reserve placed on FBH's acquisition of Farmington.

96.     At the time of the transfer, Alameda Ventures was engaged or about to engage in a business or transaction for which its remaining assets were unreasonably small, and/or Alameda Ventures intended to incur (or believed or reasonably should have believed that it would incur) debts beyond its ability to pay as they came due.

97.     The aforementioned transfer is avoidable by creditors who hold allowable unsecured claims, including creditors who were creditors before the transfer and creditors who were creditors on the Petition Date.

98.     Accordingly, the transfer should be avoided as fraudulent pursuant to applicable law and 11 U.S.C. § 544(b), and Plaintiff may recover from Farmington and FBH pursuant to Section 550 of the Bankruptcy Code the full amount of such transfer, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Plaintiff's bankruptcy estate.

**COUNT IV**
**Fraudulent Transfer Pursuant to 11 U.S.C. §§ 544(b) and 550**
**(against Chalopin)**

99.     Plaintiff reincorporates and realleges the allegations set forth in Paragraphs 1 through 78 of the Complaint as though the same were set forth in full herein.

100.    Section 544(b) of the Bankruptcy Code authorizes Plaintiff to avoid any transfer of an interest in their property that is voidable under applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent transfers are avoidable pursuant to Bankruptcy Code Section 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301, *et seq.*

101.    On February 2, 2022, Alameda Research transferred $11,500,000 to FBH pursuant to the investment into FBH.  That payment was made for the benefit of Chalopin, who was the controller of FBH.

102.    The aforementioned payment to FBH was a transfer of property of Alameda Ventures.

103.    Alameda Ventures did not receive reasonably equivalent value in exchange for the foregoing payment as the investment was virtually worthless, including because, among other reasons, Alameda Ventures' investment for a 10% interest was double the reported value of the

24

bank, and Defendants' business plan for Farmington centered on transformations that violated the conditions that the Federal Reserve placed on FBH's acquisition of Farmington.

104.    At the time of the transfer, Alameda Ventures was engaged or about to engage in a business or transaction for which its remaining assets were unreasonably small, and/or Alameda Ventures intended to incur (or believed or reasonably should have believed that it would incur) debts beyond its ability to pay as they came due.

105.    The aforementioned transfer is avoidable by creditors who hold allowable unsecured claims, including creditors who were creditors before the transfer and creditors who were creditors on the Petition Date.

106.    Accordingly, the transfer should be avoided as fraudulent pursuant to applicable law and 11 U.S.C. § 544(b), and Plaintiff may recover from Chalopin pursuant to Section 550 of the Bankruptcy Code the full amount of such transfer, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Plaintiff's bankruptcy estate.

## COUNT V
## Aiding and Abetting Breaches of Fiduciary Duties
### (against Chalopin)

107.    Plaintiff reincorporates and realleges the allegations set forth in Paragraphs 1 through 78 of the Complaint as though the same were set forth in full herein.

108.    Bankman-Fried owed fiduciary duties of good faith, loyalty, and care to Alameda Ventures as a high-ranking officer or controller of Alameda Ventures.

109.    Bankman-Fried breached his fiduciary duties by, among other things, authorizing the wasteful investment into FBH.

110.    Chalopin aided and abetted Bankman-Fried in his breaches of fiduciary duties by, among other things, inducing him to cause Alameda Research to invest into FBH at an inflated valuation.

111.    As a direct and proximate result of Chalopin's aiding and abetting breaches of fiduciary duties, Plaintiff was damaged in an amount to be determined at trial.

**COUNT VI**
**Aiding and Abetting Waste of Corporate Assets**
**(against Chalopin)**

112.    Plaintiff reincorporates and realleges the allegations set forth in Paragraphs 1 through 63 of the Complaint as though the same were set forth in full herein.

113.    Bankman-Fried was involved in the day-to-day management of Alameda Ventures, approving of all transactions.  As such, Bankman-Fried authorized and facilitated the waste of assets that the investment into FBH represented.

114.    Chalopin aided and abetted Bankman-Fried in this corporate waste by, among other things, inducing him to cause Alameda Research to invest into FBH at an inflated valuation.

115.    As a direct and proximate result of the foregoing, Plaintiff was damaged in an amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in favor of the Plaintiff and against Defendants and grant the following relief:

(a)    Award Plaintiff compensatory damages in an amount to be determined at trial;

(b)    Disgorgement of the investment into FBH paid by Alameda Ventures;

(c)    Avoid the fraudulent transfers to or for the benefit of Farmington, FBH, and Chalopin and direct Farmington, FBH, and/or Chalopin to return to Plaintiff the transferred property or the value thereof, plus pre-judgment and post-judgment interest at the maximum legal rate and to the fullest extent allowed by applicable law, together with attorney's fees and costs;

26

(e)    Award Plaintiff pre-judgment and post-judgment interest at the maximum rate permitted by law or equity;

(f)    Award Plaintiff's reasonable and necessary attorney's fees and expenses, together with all costs of court, and investigation expenses; and

(g)    Grant Plaintiff such other and further relief as this Court may deem just and proper.

Respectfully submitted,

Dated: March 17, 2025
      Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Richard S. Cobb*
Adam G. Landis (No. 3407)
Richard S. Cobb (No. 3157)
Matthew B. McGuire (No. 4366)
Howard W. Robertson, IV (No. 6903)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
      cobb@lrclaw.com
      mcguire@lrclaw.com
      robertson@lrclaw.com

-and-

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Sascha N. Rand (*pro hac vice*)
Isaac Nesser (*pro hac vice*)
Heather Christensen (*pro hac vice* forthcoming)
Ben Carroll (*pro hac vice* forthcoming)
295 Fifth Avenue
New York, New York 10016
(212) 849-7000
sascharand@quinnemanuel.com
isaacnesser@quinnemanuel.com
heatherchristenson@quinnemanuel.com
benjamincarroll@quinnemanuel.com

Matthew Scheck (*pro hac vice*)
300 West 6th St, Suite 2010
Austin, Texas 78701
matthewscheck@quinnemanuel.com

*Counsel for Plaintiff*

27