IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>FTX TRADING LTD., *et al.*,<br><br>    Debtors. | Chapter 11<br><br>Case No. 22-11068 (KBO) |
| FTX RECOVERY TRUST,<br><br>    Plaintiff,<br><br>    v.<br><br>FARMINGTON STATE CORPORATION (f/k/a FARMINGTON STATE BANK, d/b/a GENIOME BANK, d/b/a MOONSTONE BANK), FBH CORPORATION, and JEAN CHALOPIN,<br><br>    Defendants. | Adv. Proc. 24-50197 (KBO)<br><br>**Related D.I. Nos. 27 & 56** |

## MEMORANDUM ORDER[1]

    Before the Court are two motions filed by the Defendants. The first is the *Defendants' Motion to Dismiss Plaintiff's Amended Complaint* (the "Motion")[2] pursuant to Rules 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure (the "Federal Rules"), made applicable to this proceeding by Rule 7012(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). The second is the *Defendants' Motion to Stay Discovery Pending a Resolution of its Motion to Dismiss Plaintiff's Amended Complaint* (the "Motion to Stay").[3] For the reasons set forth below, the Court agrees with the Defendants that the Amended Complaint should be dismissed. Consequently, the Motion to Stay is moot and will be denied.

---

[1] Given the narrow relief addressed in this Memorandum Order, the Court writes solely for the parties. They are familiar with the procedural and substantive background of this adversary proceeding and the Debtors' complex chapter 11 proceedings.

[2] Adv. D.I. 27.

[3] Adv. D.I. 56.

1

I.       **FACTS ALLEGED IN THE AMENDED COMPLAINT**

Prior to the above-captioned chapter 11 bankruptcy proceedings, FTX Trading Ltd. and its debtor and non-debtor affiliates (collectively known as the "FTX Group") operated FTX.com and FTX.US, which were among the largest digital asset exchanges in the world. The exchanges were extraordinarily successful in attracting customers and by 2021, the FTX Group claimed to hold approximately $15 billion in assets on their platforms and to transact $16 billion in daily trading volume. As detailed extensively in the criminal proceedings, previously filed civil complaints, and reports issued by the debtors, the FTX Group's exponential growth and purported success was fueled by a number of reckless and fraudulent practices perpetrated by Samuel Bankman-Fried ("Bankman-Fried"), co-founder and Chief Executive Officer of the FTX Group, along with a group of insiders (together with Bankman-Fried, the "FTX Insiders"). These practices included, among others, wildly speculative and unhedged bets in crypto assets and "investments" in hundreds of imprudent ventures, paid for by looting the FTX Group of billions of dollars in customer deposits. The transaction at issue in this proceeding is claimed to be one of those investments.

In 2022, debtor Clifton Bay Investments LLC (formerly known as Alameda Ventures LLC) ("Alameda") invested $11.5 million into Defendant FBH Corporation ("FBH") in exchange for a 10% interest in FBH (the "Transfer").[4] At the time of the Transfer, FBH was a holding company with a single asset valued at $5.7 million; namely an equity interest in Farmington State Bank ("Farmington"), a single-branch bank and community lender to the small agricultural town of Farmington, Washington.[5]

FBH is owned and controlled by Defendant Jean Chalopin ("Chalopin"). In 2020, Chalopin formed FBH and orchestrated FBH's acquisition of Farmington.[6] Though the acquisition received the approval of regulators from both the Federal Reserve and the State of Washington, it was subject to certain restrictions. This included, among other things, the requirement that written regulatory approval be obtained prior to changes in senior management, changes in the business plan, and significant forays into digital banking services.[7]

Prior to the Transfer, Chalopin was known to the FTX Group because of his affiliation with other companies that assisted with the FTX Group's banking and insurance operations, including Bahamas-based Deltec Bank and Trust Company Limited ("Deltec Bank"), a subsidiary of Deltec International Group, in which Chalopin has ultimate beneficial ownership of a controlling interest. The FTX Group held several accounts at Deltec Bank, which processed hundreds of thousands of transactions worth billions of dollars. Chalopin helped lay the foundation necessary for the FTX Group to move to the Bahamas, as he and Deltec Bank used their connections in the Bahamas to advance the FTX Group's interests.[8]

---

[4] Adv. D.I. 21 at 4 (*Amended Complaint*) ("Amended Complaint").

[5] *Id.* ¶¶ 48-49, 53.

[6] *Id.* ¶¶ 4, 34, & 45.

[7] *Id.* ¶¶ 45-46.

[8] *Id*. ¶¶ 36-38.

2

Having done profitable business together for years, Chalopin and the FTX Group set their sights on recreating this symbiosis of banks and cryptocurrency companies in the United States. In 2021, Chalopin became acquainted with a legal officer for the FTX Group (the "FTX Legal Officer") with whom he began discussing a potential investment in FBH by the FTX Group.[9] By January 2022, the agreement between Alameda and FBH was executed (the "Subscription Agreement") and on February 2, 2022, the Transfer was made.[10] At the time of the Transfer, FBH contemplated a new business plan for Farmington. The Bank was to "develop and operate a new separate and distinct digital banking business unit focused on serving the 'mass-affluent' and tech-savvy young high net worth individuals and the newer, innovative, and often disruptive small and medium size business enterprises that have difficulties finding adequate banking services."[11]

Soon after the Transfer, the FTX Group opened bank accounts with Farmington[12] to facilitate a $50 million tax safe-harbor required by a transaction with another United States company.[13] Moreover, though the necessary regulatory approvals had not yet been obtained, in the months following the Transfer, Farmington touted "significant progress . . . on becoming the only fully chartered bank dedicated to offering a wide array of financial services to specialty industries," including the cryptocurrency industry.[14] By the start of November 2022, Chalopin told the FTX Legal Officer that the bank was ready to go with a program to implement the new business model and inquired about whether the FTX Group would be making an additional $50 million deposit.[15] By this time, however, the FTX Group was in a freefall.

On November 11, 2022, the Debtors filed for Chapter 11 bankruptcy. On January 4, 2023, following the indictment of Bankman-Fried, federal prosecutors seized the $50 million in the FTX Group account at Farmington. Quickly thereafter, Farmington closed its crypto client bank accounts, stating that it was "returning to its original mission as a community bank."[16]

On July 18, 2023, the Federal Reserve announced an enforcement action against Farmington and FBH for engaging in activities that changed Farmington's business plan and character without approval (the "Enforcement Action"). The Enforcement Action provided for Farmington's operations to wind down and prohibited Farmington or FBH from, among other

---

[9] *Id.* ¶¶ 48-49, 53.

[10] *Id.* ¶ 52.

[11] Adv. D.I. 74 § 4.5.

[12] Following execution of the Subscription Agreement, Farmington rebranded itself as "Geniome Bank" and then again as "Moonstone Bank," but eventually rebranded back to "Farmington Bank." Amended Complaint ¶¶ 54-57. For ease of reference, the Court will refer to the bank as "Farmington."

[13] *Id.* ¶ 8.

[14] *Id.* ¶ 54-55.

[15] *Id.* ¶ 56.

[16] *Id.* ¶¶ 56-57.

things, issuing dividends, making capital distributions, or dissipating cash assets. As a result, the FTX Group's investment was rendered worthless.[17]

## II. RELEVANT PROCEDURAL HISTORY

The FTX Recovery Trust ("Plaintiff") commenced this adversary proceeding against the Defendants asserting claims for fraudulent transfer, aiding and abetting breach of fiduciary duty, and aiding and abetting corporate waste. Defendants seek dismissal of the Amended Complaint. Briefing is complete and oral argument was held on November 13, 2025.

## III. JURISDICTION AND VENUE

The Court has subject-matter jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334(b), 28 U.S.C. § 157, and the *Amended Standing Order of Reference* of the United States District Court for the District of Delaware. Venue is proper pursuant to 28 U.S.C. § 1409(a).

## IV. LEGAL STANDARD

Federal Rule 12(b)(6) provides for dismissal for "failure to state a claim upon which relief can be granted."[18] To survive a motion to dismiss, a plaintiff must allege well-pleaded facts with sufficient detail to "state a claim to relief that is plausible on its face."[19] The Third Circuit has adopted a two-part analysis to employ when deciding a motion to dismiss for failure to state a claim.[20] "First, the factual and legal elements of a claim should be separated" with the reviewing court accepting "all of the complaint's well-pleaded facts as true, but . . . disregard[ing] any legal conclusions."[21] Next, the reviewing court must "determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'"[22]

Federal Rule 12(b)(2) provides for dismissal for "lack of personal jurisdiction."[23] Unlike review under Rule 12(b)(6), review under Rule 12(b)(2) is not always limited to the face of the pleadings. If a defendant submits an affidavit contradicting the allegations of a complaint, the plaintiff cannot rest on its complaint but must submit its own evidence in support of jurisdiction.[24] However, "[w]ithout an opposing affidavit, courts review the complaint for the sufficiency of its

---

[17] *Id.* ¶¶ 59-60.

[18] FED. R. CIV. PROC. 12(b)(6).

[19] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

[20] *Fowler*, 578 F.3d at 210.

[21] *Id.* at 210-11.

[22] *Id.* (quoting *Iqbal*, 556 U.S. at 679).

[23] FED. R. CIV. PROC. 12(b)(2).

[24] *Claridge Assocs., LLC v. Schepis (In re Pursuit Capital Mgmt., LLC)*, 595 B.R. 631, 646 (Bankr. D. Del. 2018) ("If an opposing affidavit contradicts the complaint's allegations, a plaintiff must present similar evidence in support of personal jurisdiction.").

allegations, and the plaintiff need only plead a *prima facie* case of personal jurisdiction."[25]  "A plaintiff may establish a *prima facie* case by 'establishing with reasonable particularity sufficient contacts between the defendant and the forum state to support jurisdiction.'"[26]

## V. DISCUSSION

### A. Claims Against Individual Defendant Chalopin (Counts II, IV, V, & VI)

#### 1. Personal Jurisdiction – Federal Rule 12(b)(2)

Under Bankruptcy Rule 7004, a court has personal jurisdiction over a defendant if three requirements are met:

> (1) service of process has been made in accordance with Bankruptcy Rule 7004 or Civil Rule 4; (2) the court has subject matter jurisdiction under section 1334 of the [Judicial] Code [28 U.S.C. § 1334]; and (3) exercise of jurisdiction is consistent with the Constitution and the laws of the United States.[27]

To satisfy constitutional due process, a defendant must have "purposefully established 'minimum contacts' in the forum,"[28] such that the exercise of jurisdiction "does not offend traditional notions of fair play and substantial justice."[29]  The minimum contacts analysis focuses on the relationship between the defendant, the forum, and the litigation,[30] such that the defendant has fair warning it may be subject to suit in that forum.[31]

---

[25] *Id.*

[26] *Id.* (quoting *Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Ass'n,* 819 F.2d 434, 437 (3d Cir. 1987)).

[27] *Tribune Media Servs. v. Beatty (In re Tribune Co.)*, 418 B.R. 116, 121 (Bankr. D. Del. 2009) (internal citations omitted).  Defendants argue that the Delaware long-arm statute applies to personal jurisdiction over Chalopin for Plaintiff's fraudulent transfer claims under section 544 of the Code and the Delaware Uniform Fraudulent Transfer Act but "a federal court's personal jurisdiction may be assessed on the basis of the defendant's national contacts when the plaintiff's claim rests on a federal statute authorizing nationwide service of process."  *Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361, 369 (3d Cir. 2002).  Accordingly, because of Bankruptcy Rule 7004, "the Court need not look to the Delaware long-arm statute, or the case law interpreting it, to determine whether it has personal jurisdiction over [Defendants]."  *In re AstroPower Liquidating Tr.*, 335 B.R. 309, 317 (Bankr. D. Del. 2005).

[28] *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985).

[29] *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (citations omitted); *see also Marten v. Godwin*, 499 F.3d 290, 296 (3d Cir. 2007).

[30] *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977).

[31] *Marten*, 499 F.3d at 296.

A federal court must have one of two forms of personal jurisdiction to comport with these principles: either general jurisdiction or specific jurisdiction.[32] Specific jurisdiction exists when the cause of action arises from the defendant's forum related activities.[33] "In contrast, general jurisdiction does not require that the defendant's connections be related to the particular cause of action, but that the defendant has continuous or systematic contacts with the forum state."[34] In bankruptcy cases, the relevant forum for purposes of personal jurisdiction is the United States, not the state in which the bankruptcy court sits.[35]

Defendants argue that the Plaintiff has not established that Chalopin, a resident of the Bahamas, has the necessary contacts with the United States.[36] They contend that Chalopin's only alleged contact with the forum is his interaction with an FTX Legal Officer, which is not enough to support jurisdiction. Plaintiff responds that jurisdiction over Chalopin is proper because the transaction at issue – the Debtors' investment in FBH – arose directly from Chalopin's actions either taken within or directed towards the United States including: (1) Chalopin's formation of a Maryland corporation (FBH) for the purpose of acquiring a Washington corporation (Farmington); (2) his attendance at meetings with regulators in the United States to discuss the Farmington acquisition; (3) his video meetings with the United States-based FTX Legal Officer about the investment; (4) his attendance at a meeting in the United States with the FTX Legal Officer; and (5) his signature, as president of FBH, on the Subscription Agreement, which is governed by Maryland law and designates Maryland as the forum of choice for disputes.[37]

The Court agrees with Plaintiff and finds that the facts alleged establish with reasonably particularity that there are sufficient contacts between Chalopin and the United States to support jurisdiction. Defendants have not presented any argument as to why exercising such jurisdiction would "offend 'traditional notions of fair play and substantial justice.'"[38] Accordingly, the Amended Complaint sets forth a *prima facie* case of jurisdiction.

### 2. Constructive Fraud (Counts II and IV)

In Counts II and IV, Plaintiff seeks to avoid and recover the Transfer from Chalopin as a fraudulent transfer pursuant to sections 544, 548, and 550 of the Bankruptcy Code (the "Code").

---

[32] *See D'Jamoos ex rel. Estate of Weingeroff v. Pilatus Aircraft Ltd.*, 566 F.3d 94, 102 (3d Cir. 2009) (citing *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414-15 (1984)).

[33] *Chavez v. Dole Food Co.*, 836 F.3d 205, 223 (3d Cir. 2016).

[34] *Gurmessa v. Genocide Prevention in Ethiopia, Inc.*, No. CV 21-869-RGA, 2023 WL 2683497, at *2 (D. Del. Mar. 29, 2023).

[35] *AstroPower*, 335 B.R. at 317.

[36] In their reply brief, Defendants argue, for the first time, that service of process was also improper. However, because Defendants did not raise that argument in their opening brief, it has been waived. *Laborers' Int'l Union v. Foster Wheeler Corp.*, 26 F.3d 375, 398 (3d Cir. 1994) ("An issue is waived unless a party raises it in its opening brief."); *In re Catholic Diocese of Wilmington, Inc.*, 437 B.R. 488, 492 (Bankr. D. Del. 2010) (holding that issues raised for the first time in a reply brief are waived).

[37] Amended Complaint ¶¶ 4, 21, 22, 45.

[38] *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

Defendants move to dismiss these claims on the ground that Plaintiff has failed to plausibly allege that Chalopin was a transferee as required by section 550.

Section 550(a)(1) provides that the trustee may recover an avoided fraudulent transfer from "the initial transferee of such transfer or the entity for whose benefit such transfer was made[.]"[39] As this Court explained in *In re Samson Res. Corp.*, the test for determining if a defendant is an entity "for whose benefit the transfer was made" is whether that defendant received an "actual, quantifiable, and accessible benefit."[40] The allegations of the Amended Complaint do not satisfy this test.

While Plaintiff alleges that Chalopin was FBH's "principal shareholder (and, on information and belief, it's only shareholder) and president," it has not alleged any facts that would support the conclusion that Chalopin received a tangible benefit from the Transfer. In relying solely on Chalopin's status as owner and controller of FBH, Plaintiff appears to suggest that having the ability to benefit is the same as receiving a benefit. It is not. Without some additional facts from which one could reasonably infer that an actual, quantifiable, and accessible benefit was received, an individual's status as owner and controller of a transferee entity, standing alone, is not sufficient to establish that such individual was a beneficial transferee.[41]

Neither of the cases cited by Plaintiff in support of its position change this result. Plaintiff first cites to *MTE Holdings*, for the proposition that a transfer is recoverable not only from a company but also from the company's owner or controller.[42] But this overstates the holding in that case. Not only was this issue undisputed in *MTE*, but as the court explained, the evidence before it showed that the defendant "directed the transfers be made into accounts that he controlled for the purpose of paying himself."[43] Plaintiff has made no such allegation.

Plaintiff next points to *In re Buckhead Am. Corp.*, where the court stated in a footnote that it rejected defendants' argument "that a party's ownership, dominion and control over another party who is the direct transferee of a fraudulent transfer are not sufficient grounds for a finding

---

[39] 11 U.S.C. § 550(a).

[40] *In re Samson Res. Corp.,* No. 15-11934 (BLS), 2022 WL 3135288, at *7 (Bankr. D. Del. Aug. 4, 2022) ("To recover from a transfer beneficiary under § 550(a)(1), a trustee must show that the benefit: (i) must actually have been received by the beneficiary; (ii) must be quantifiable; and (iii) must be accessible to the beneficiary.").

[41] *Compare In re BYJU'S Alpha, Inc.*, No. 24-10140, 2025 WL 659092, at *12 (Bankr. D. Del. Feb. 27, 2025) (denying motion to dismiss where plaintiff made "extensive factual allegations in support of its assertion that [defendant] entities are a sham" and were "simply a tool for their founder, Mr. Morton, to perpetrate a fraud") *with Opioid Master Tr. II v. Argos Cap. Appreciation Master Fund LP (In re Mallinckrodt PLC)*, Nos. 20-12522, 22-50435, 2024 Bankr. LEXIS 2058 (Bankr. D. Del. Sep. 5, 2024) (dismissing investment managers where only evidence offered in support of argument that defendants were beneficial transferees was corporate governance documents showing that defendants possessed the authority to control the transferred funds, not that they exercised that authority and received any benefit).

[42] *RPA Asset Mgmt. Servs., LLC v. Siffin (In re MTE Holdings*, LLC), No. 19-12269, 2024 WL 3272224, at *8 (Bankr. D. Del. June 14, 2024).

[43] *Id*.

that the controlling party is an 'entity for whose benefit such transfer was made' within the meaning of section 550."[44] As the court made clear in the remainder of the footnote, its rejection of this argument was "because the issue of the precise facts which must be proven in order for plaintiff to prevail on this claim is not presently before the Court."[45] The court concluded that "[f]or pleading purposes, it is enough that plaintiff alleges that defendants are 'entities for whose benefit such transfer was made.'"[46] While this Court agrees that, standing alone, this excerpt could support Plaintiff's position, Plaintiff overlooks the critical fact that the court in *Buckhead* applied a motion to dismiss standard considerably different than the standard applicable now.

As a case that pre-dates the Supreme Court's decision in *Twombly*,[47] the plaintiff's complaint in *Buckhead* was subject to the more lenient "no set of facts" standard, under which a complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove *no set of facts* in support of his claim which would entitle him to relief."[48] But following *Twombly*, "the 'no set of facts' language may no longer be used as part of the Rule 12(b)(6) standard."[49] Now, to survive a Rule 12(b)(6) motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."[50] While under the old standard, conclusory allegations such as that cited by the court in *Buckhead* might pass muster, under the current standard, "a formulaic recitation of a cause of action's elements will not do."[51] Accordingly, Plaintiff's allegation that "the payment was made for the benefit of Chalopin, who was the controller of FBH[,]"[52] is insufficient to support the conclusion that Chalopin was a beneficial transferee. Counts II and IV will be dismissed.

### 3. Aiding And Abetting Breach Of Fiduciary Duty (Count V)

In Count V, Plaintiff alleges that Chalopin aided and abetted Bankman-Fried's breach of his fiduciary duties by inducing him to cause Alameda to invest into FBH at an inflated valuation.[53] To state a claim for aiding and abetting breach of fiduciary duty, a plaintiff must establish "(1) the existence of a fiduciary relationship; (2) a breach of the fiduciary's duty, . . . (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the

---

[44] *Official Comm. of Unsecured Creditors of Buckhead Am. Corp. v. Reliance Capital Grp. (In re Buckhead Am. Corp.)*, 178 B.R. 956, 963 (D. Del. 1994).

[45] *Id.*

[46] *Id.*

[47] *Twombly*, 550 U.S. at 570; *Fowler*, 578 F.3d at 210 (citing *Iqbal*, 556 U.S. at 678).

[48] *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) (emphasis added).

[49] *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 232 (3d Cir. 2008).

[50] *Twombly*, 550 U.S. at 570.

[51] *Id.* at 548.

[52] Amended Complaint ¶¶ 86, 101.

[53] *Id*. ¶¶ 107-11.

8

breach."[54] Defendants assert that Plaintiff has failed to alleged Chalopin's knowing participation in Bankman-Fried's breach of fiduciary duty.[55] The Court agrees.

The "knowing participation" element "is often the most difficult to prove and involves two distinct concepts that are sometimes analyzed separately: knowledge and participation."[56] To establish that a defendant had the necessary *scienter* for an aiding and abetting claim, a plaintiff must prove two types of knowledge: (1) knowledge that the primary party has breached its fiduciary duty, and (2) knowledge that the aider and abettor's own conduct regarding the breach was improper.[57] Additionally, the aider and abettor's knowledge must be "actual knowledge."[58] "Of course, circumstantial evidence — 'such as the defendant's possession of documents or presence during relevant conversations' — might suffice to establish the defendant's knowledge of the underlying breach, but that knowledge must still be actual."[59] To establish the participation prong, a plaintiff must prove that "the aider and abettor provided 'substantial assistance' to the primary violator."[60] "This means that an aider and abettor's participation in a primary actor's breach of fiduciary duty must be of an active nature."[61]

Plaintiff has not alleged facts sufficient to satisfy either the knowledge prong or the participation prong of an aiding and abetting claim. Plaintiff argues that it has alleged (1) Chalopin "possessed intimate knowledge of the FTX Group's cash flows and financial condition through his control of Deltec Bank", and that (2) "under Chalopin's direction, the bank exempted the FTX Group from regulatory scrutiny and openly acted 'outside the guidelines' to accede to [Bankman-Fried's] wishes."[62] Not so. In the Amended Complaint, Plaintiff has not alleged that Chalopin had *any* knowledge of the FTX Group's cash flows or financial condition, let alone the "intimate knowledge" it asks the Court to infer. Also missing are allegations that Chalopin was involved in any manner in the day-to-day operations of Deltec Bank or that he knew (or would even have reason to know) about actions taken by Deltec Bank with respect to the FTX Group's accounts.[63]

---

[54] *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001).

[55] Because Defendants have not challenged the Plaintiff's allegations regarding a breach of fiduciary duty by Bankman-Fried, the Court will assume their sufficiency for purposes of analyzing this claim. This assumption should not, however, be interpreted as the Court's conclusion that Plaintiff has sufficiently alleged a breach of fiduciary duty. *See infra* Section V(B)(3)(b) (discussing reasonably equivalent value).

[56] *In re Mindbody, Inc., Stockholder Litig.*, 332 A.3d 349, 390 (Del. 2024).

[57] *Id.* 390-91.

[58] *In re Columbia Pipeline Grp., Inc. Merger Litig.*, 342 A.3d 324, 356 (Del. 2025) ("[I]t is not 'enough to prove that the defendant should have known of the primary actor's wrongful conduct. The defendant's knowledge must be actual.'") (quoting RESTATEMENT (THIRD) OF TORTS § 28, cmt c. (AM. LAW. INST. 2020) (Oct. 2024 update)).

[59] *Id.*

[60] *Mindbody,* 332 A.3d at 392.

[61] *Columbia Pipeline*, 342 A.3d at 361.

[62] Adv. D.I. 52 (*Plaintiff's Notice of Supplemental Authority*) at 3.

[63] Amended Complaint ¶¶ 36, 39, 41-43 (alleging only that Chalopin held a controlling interest in the parent company of Deltec Bank, that Deltec Bank processed transactions for FTX, that Chalopin described Deltec

In short, Plaintiff has alleged no facts to support the conclusion that Chalopin had the level of knowledge necessary to support its claim. Plaintiff also fails to allege that Chalopin "substantially assisted" in a breach of fiduciary duty by Bankman-Fried. On the contrary, the allegations indicate that Chalopin's discussions about the investment were not with Bankman-Fried but with the FTX Legal Officer. Nothing in the Amended Complaint suggests that Chalopin had anything more than limited insight into the FTX Group's plans regarding its investment into FBH or that Chalopin induced the investment.[64] For these reasons, Count V will be dismissed.

### 4. Aiding And Abetting Corporate Waste (Count VI)

In Count VI, Plaintiff asserts a claim against Chalopin for aiding and abetting corporate waste. While it is not confirmed that the claim of aiding and abetting corporate waste exists under Delaware law, the Court need not decide that question to resolve the Motion. The parties agree that to state such a claim Plaintiff would need to allege (1) the existence of an act constituting corporate waste; (2) the aider and abettor's knowledge of the act of corporate waste; and (3) the aider and abettor's knowing and substantial participation in the act of corporate waste.[65] To state a claim for corporate waste, a plaintiff must allege facts "that show that the economics of the transaction were so flawed that no disinterested person of right mind and ordinary business judgment could think the transaction beneficial to the corporation."[66]

Defendants move to dismiss this claim for Plaintiff's failure to plead knowing participation. The Court agrees. Even assuming, *arguendo*, that Plaintiff has sufficiently alleged that the Transfer was an act of corporate waste,[67] Plaintiff has not alleged facts to support the remaining elements of the claim. Accordingly, Count VI will be dismissed.

### B. Claims Against The Corporate Defendants (Counts I & III)

Plaintiff seeks to avoid and recover the Transfer from Farmington and FBH as a constructive fraudulent transfer pursuant to section 548(a)(1)(B) of the Code (Count I) and section

---

Bank's parent company as "a long-time friend of FTX," and that Deltec Bank's Chief Executive Officer gave FTX preferential treatment).

[64] *See id.* ¶ 49 ("In August 2021, Chalopin and Legal Officer-1 started discussing an investment by the FTX Group into FBH"); *id.* ¶ 50 ("On August 22, 2021, Chalopin asked Legal Officer-1, "As I am preparing the papers for the investment into our WA bank, could you let me know if the company (or person?) investing into it would be US or non-US?").

[65] *See Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*, 331 F.3d 406, 415 (3d Cir. 2003) ("The elements of aiding and abetting are: (1) the commission of a wrongful act; (2) knowledge of the act by the alleged aider-abettor; and (3) the aider-abettor knowingly and substantially participated in the wrongdoing.").

[66] *Miller v. Bradley (In re W.J. Bradley Mortg. Capital, LLC)*, 598 B.R. 150, 175 (Bankr. D. Del. 2019) (quoting *In re Fedders N. Am., Inc.*, 405 B.R. at 549 (citing *Harbor Fin. Partners v. Huizenga*, 751 A.2d 879, 893 (Del. Ch. 1999)).

[67] *See infra* Section V(B)(3)(b) (discussing reasonably equivalent value).

544(b) of the Code and the Delaware Uniform Fraudulent Transfer Act ("DUFTA")[68] (Count III). Defendants move to dismiss these claims on several grounds.

### 1. Triggering Creditor – 11 U.S.C. § 544(b)

Section 544 allows a Trustee to bring certain claims for the benefit of all creditors by "stepping into the shoes" of the debtors' unsecured creditors to realize upon their state law claims.[69] Defendants argue that Plaintiff lacks standing to assert a section 544 claim because Plaintiff fails to identify a specific creditor into whose shoes it is stepping. Rather, it alleges that the Transfer "is avoidable by creditors who hold allowable unsecured claims, including creditors who were creditors before the transfer and creditors who were creditors on the Petition Date."[70] The Court agrees with the Plaintiff that it need not identify a specific creditor or prove the existence of a qualifying triggering creditor at this stage, but may simply allege that such creditor exists.[71]

### 2. Securities Safe Harbor – 11 U.S.C. § 546(e)

Defendants next argue that the Transfer is shielded from avoidance by section 546(e) of the Code. Section 546(e) provides a "safe harbor" against certain fraudulent transfer claims arising out of securities transactions. It applies as a defense "when two requirements are met: '(1) there is a *qualifying transaction* (*i.e.*, there is a 'settlement payment' or a transfer payment . . . made in connection with a securities contract), and (2) there is a *qualifying participant* (*i.e.*, the transfer was 'made by or to (or for the benefit of) a . . . financial institution, [or financial participant]')."[72]

Defendants submit that the Transfer satisfies both requirements of section 546(e). First, they argue that the transfer of $11.5 million in exchange for 110,000 shares of stock constitutes a "settlement payment" that was made pursuant to the Subscription Agreement, a securities contract. Plaintiff's do not dispute the satisfaction of this element. Second, however, Defendants claim that the Transfer was for the benefit of Farmington, which constitutes a "financial institution" as an

---

[68] 6 Del. C. § 1301 *et. seq.*

[69] *See UMB Bank, N.A. v. Sun Capital Partners (In re LSC Wind Down, LLC)*, 610 B.R. 779, 784 (Bankr. D. Del. 2020). 11 U.S.C. § 544(b) ("[T]he trustee may avoid any transfer of an interest of the debtor in property . . . that is voidable under applicable law by a creditor holding an unsecured claim that is allowable . . . .").

[70] Amended Complaint ¶¶ 97, 105.

[71] *Beskrone v. Opengate Capital Grp., LLC (In re Pennysaver USA Publ'g, LLC)*, 602 B.R. 256, 267 (Bankr. D. Del. 2019) ("At the pleading stage, the Trustee does not need to allege the existence of or name an unsecured creditor and may claim avoidance of any transfers incurred by the debtor under 'applicable law.'"); *see also In re APF CO.*, 274 B.R. 634, 639 (Bankr. D. Del. 2001) ("When analyzing the sufficiency of a complaint for purposes of Rule 12(b)(6), courts do not generally require a trustee to plead the existence of an unsecured creditor by name, although the trustee must ultimately prove such a creditor exists.").

[72] *In re Quorum Health Corp.*, No. 20-10766, 2023 WL 2552399, at *5 (Bankr. D. Del. Mar. 16, 2023) (quoting 11 U.S.C. § 546(e) and *In re Nine W. LBO Sec. Litig.*, 482 F. Supp. 3d 187, 197 (S.D.N.Y. 2020), *aff'd in part, vacated in part, remanded sub nom. In Re: Nine W. LBO Sec. Litig.*, 87 F.4th 130 (2d Cir. 2023)) (emphasis in original).

undisputed bank.[73] Plaintiff disagrees with this assertion because it alleges that the Transfer was to and for the benefit of FBH – not Farmington, and Defendants do not assert that FBH is a qualifying participant under section 546(e). Nothing in the Amended Complaint or the Subscription Agreement[74] makes it clear that the Transfer was for the benefit of Farmington. Therefore, consideration of Defendants' defense at this stage is premature.[75]

### 3. Failure To State A Claim – Federal Rule 12(b)(6)

Defendants finally move to dismiss the constructive fraudulent transfer counts for Plaintiff's failure to allege that that the Transfer was for less than reasonably equivalent value at a time when the Debtors were insolvent. Both elements are necessary to state a claim under the Code and DUFTA. While the Court concludes that Plaintiff adequately pleads insolvency, it agrees with the Defendants that Plaintiff does not adequately plead reasonably equivalent value.

#### a. *Insolvency*

Read in its entirety, the Amended Complaint contains enough facts to support the conclusion that Alameda was insolvent at the time of the Transfer. For example, in paragraph 75, Plaintiff alleges:

> [Alameda's] assets at the relevant time primarily included investments by FTX Insiders into tenuous and speculative ventures, which were worth only a fraction of the amounts invested. The fair value of these assets was substantially lower than the size of [Alameda's] liabilities. [Alameda] also had inadequate and unreasonably small capital to operate its business. [Alameda] continued to operate only because the FTX Insiders continually concealed and lied about its financial condition.[76]

---

[73] *See* 11 U.S.C. § 741(8) and § 101(22).

[74] The Court can "generally consider only the allegations contained in the complaint, exhibits attached to the complaint[,] and matters of public record" in evaluating a motion pursuant to Federal Rule 12(b)(6). *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). But the Court can also consider "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Id.* The Subscription Agreement was referenced in the Amended Complaint, *see, e.g.*, Amended Complaint ¶¶ 52-53, provided by Defendants, *see* D.I. 74, and relied upon by Plaintiff during oral argument.

[75] *In re Centaur, LLC*, No. 10-10799, 2013 WL 4479074, at *4 (Bankr. D. Del. Aug. 19, 2013) (noting that the question of whether section 546(e) applies "requires a determination of fact and is not suitable for disposition on a motion to dismiss[,]" unless "the defense is clearly established on the face of the complaint[.]") (citing *In re Plassein Int'l Corp.*, 590 F.3d 252 (3d Cir. 2009)).

[76] Amended Complaint ¶ 75.

Defendants argue that these allegations are directly contradicted by Plaintiff's allegation that Alameda had a "virtually unlimited line of credit."[77] However, it is clear from the context of the Amended Complaint that the reference to Alameda's credit line serves to add detail about how the FTX Insiders caused Alameda to incur debts without regard to its ability to repay them. Indeed, the sentence immediately following the mention of Alameda's expansive credit line, begins "Alameda lacked the ability to repay this line of credit[.]"[78]

        b.      *Reasonably Equivalent Value*

"[A] party receives reasonably equivalent value for what it gives up if it gets 'roughly the value it gave.'"[79] Plaintiff alleges that Alameda paid $11.5 million for an approximate 10% interest in FBH.[80] Such an investment implies a $115 million valuation of FBH when, in reality, its only asset at the time was Farmington, worth approximately $5.7 million.[81] According to Plaintiff, this is sufficient to allege that Alameda grossly overpaid for the equity and that the Transfer lacked reasonably equivalent value.

As correctly highlighted by the Defendants, the problem with this whole-cloth reliance upon Farmington's reported net worth at the time of the transfer for establishing lack of reasonably equivalent value is that Plaintiff ignores its own acknowledgement in the Amended Complaint that the Transfer occurred when a future business plan existed to expand Farmington from a small community bank into one offering cutting-edge cryptocurrency services.[82] Plaintiff makes no factual allegations from which the Court can reasonably infer that the possible, future value of this plan at the time of the Transfer was less than Alameda's investment. This is an element necessary to adequately state the fraudulent transfer claims, and it is unaddressed in the Amended Complaint.

Plaintiff argues that it has alleged facts supporting a conclusion that the business plan had no value at its inception, but the Court's reading of the Amended Complaint is the opposite. Plaintiff concedes that Farmington's successful transformation would have had huge upside potential for ***both*** sides:

> [H]aving done profitable business with the FTX Group for years through Deltec, Chalopin knew the potential value to his business interests in pairing banking with cryptocurrency. The FTX Group

---

[77] *Id.* ¶¶ 46, 64.

[78] *Id.* ¶ 64 ("As of the commencement of the Chapter 11 cases, the exchange's software had been tampered with to an extent sufficient to expand Alameda's 'line of credit' to $65 billion. Alameda lacked the ability to repay this line of credit, having spent the money on insider transfers and purported 'loans,' gifts, and questionable investments, including the $11.5 million transferred to Defendants.").

[79] *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 631 (3d Cir. 2007).

[80] *See, e.g.*, Amended Complaint ¶ 52.

[81] *Id.* ¶ 53.

[82] *See, e.g., id.* ¶ 9 (indicating that the Alameda investment was based on the new business model); *see also* Subscription Agreement, Art. IV (discussing, among other things, the Bank's "new business plan" and the associated risks).

13

>knew the potential value to their business interests of having a friendly bank run by a friendly associate. Together, they set their sights on recreating this symbiosis of banks and cryptocurrency companies in a new market: the United States.[83]

This potential value, however, was rendered worthless due to actions taken by Chalopin and the Federal Reserve after the Transfer. Specifically, according to Plaintiff, Chalopin never sought the known, necessary regulatory approvals before implementing the business plan to transform and expand Farmington's banking services.[84] Therefore, the Federal Reserve pursued an enforcement action that later devalued Alameda's investment:

>The Federal Reserve's enforcement action provided for Farmington's operations to wind down and prohibited Farmington or FBH "from making dividends or capital distributions, dissipating cash assets, and engaging in certain activities without approval from its supervisors." ***As a result, the FTX Group's $11.5 million dollar investment has been rendered worthless, or, at a minimum, has lost a significant amount of its value***.[85]

Nowhere in the Amended Complaint does Plaintiff allege that the investment had no chance of generating a positive return from the start.[86] For instance, there are no facts to suggest that at the time of the Transfer the business plan would be implemented before obtaining regulatory approval.[87] Moreover, there are no allegations from which the Court could infer Chalopin knew about the larger fraud occurring within the FTX Group, that his affiliated Bahamian entities were a part of it, or that the investment in FBH was a sham designed to further FTX Group's fraudulent or illegal activities in the United States.

Because Plaintiff has failed to allege that the Transfer was for less than reasonably equivalent value, Counts I and III will be dismissed.[88]

---

[83] Amended Complaint ¶ 44.

[84] *See, e.g.*, *id.* ¶¶ 7, 9; *see also* Subscription Agreement § 4.5 (disclosing that regulatory approval was necessary but that it may not be obtained).

[85] Amended Complaint ¶ 60 (emphasis added).

[86] *See Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L. (In re R.M.L.)*, 92 F.3d 139, 152 (3d Cir. 1996) ("[S]o long as there is some chance that a contemplated investment will generate a positive return at the time of the disputed transfer, we will find that value has been conferred.").

[87] On the contrary, the Subscription Agreement discloses that approval was necessary and that it may not be obtained, reasonably implying that approval would be sought. Subscription Agreement § 4.5.

[88] This serves as another basis for dismissing Counts II and IV against Chalopin.

## VI. CONCLUSION

For the reasons stated above, it is hereby **ORDERED** that the Amended Complaint is **DISMISSED**. Additionally, the relief requested in the Motion to Stay is **DENIED** as moot.

Dated: November 25, 2025
Wilmington, Delaware

Karen B. Owens
Chief Judge